### THE MALCOLM BAXTER, JR.

(District Court, S. D. New York. October 15, 1918.)

#### No. 62–260.

1. SHIPPING ⬳51—CHARTER—DEFAULT OF VESSEL.
   Where the owner of a chartered vessel is willing to perform the charter, nothing short of certainty that he cannot perform can impose upon him a default on the ground of impossibility.

2. SHIPPING ⬳39—CHARTER—CONSTRUCTION OF CHARTER PARTY.
   Provision of a charter party for a vessel to carry a cargo to Holland in war time that it should be consigned to the Netherlands Overseas Trust, without whose permit the vessel could not pass the British patrols, *held* in effect one requiring charterer to obtain such permit.

In Admiralty. Suit against the schooner Malcolm Baxter, Jr., for breach of charter. Decree for respondent.

This is a suit in rem in the admiralty against the schooner Malcolm Baxter, Jr., to recover freight prepaid under the terms of a charter party entered into between the parties on January 23, 1917. The claimant was the owner of the schooner, and the libelant the owner of a cargo of corn oil meal which they wished to ship to Holland. The charter party provided that the schooner should carry the cargo to Rotterdam and that the libelant should pay $38 a ton; "full freight to be prepaid in New York when vessel loaded, without discount, and earned retained and irrevocable vessel and/or cargo lost or not lost." Later it provided: "Cargo to be consigned to the Netherlands Overseas Trust of the Netherlands government. Any detention of the vessel by Great Britain or her allies to count as lay days against charterers, if detained longer than forty-eight hours." It contained no exceptions in favor of the ship.

A permit had been issued by the Netherlands Overseas Trust on November 14, 1916, to a Dutch firm, "The Widow Cleyndert," the real consignee, under which, however, the cargo was to be shipped "by one of the shipping companies affiliated by the Netherlands Overseas Trust," and which did not, therefore, cover the Baxter. On January 26, 1917, recognizing the insufficiency of this permit, the Widow Cleyndert applied to the Netherlands Overseas Trust for another to allow the cargo to be shipped on the Baxter, upon • which no action was definitely taken until April 4th, when the Trust withdrew its original permit unless the cargo went forward by steamer. The British government had meanwhile decided to pass no sailing vessels with contraband, which the cargo was. Between January 26th and shortly before April

4th, this question had been in some doubt, and it does not certainly appear whether or not any sailing vessels had passed the blockade.

Meanwhile the loading was completed early in February, and the libelant made independent efforts to secure the necessary permit through the Widow Cleyndert, but, as has appeared, without success. As the lay days had long since expired, and as there appeared to be no prospect of the schooner's getting through the blockade, on March 29th, the libelant denounced the charter party and discharged the schooner early in April, under an agreement between the parties not necessary to detail.

The second article of the libel contained the following allegations explanatory of the practice which obtained in the forwarding of Dutch cargoes and in view of which the charter party was drawn:

"That the allies, having enforced by this means an effectual supervision over all merchandise entering Holland by sea, entered into an agreement with the Netherlands government by which all merchandise whatever should be consigned to the Netherlands Overseas Trust Company, hereinafter called the Trust. The Trust, as libelant is informed and believes, is a corporation in the nature of a Chamber of Commerce for the kingdom of the Netherlands, acting under the control of the Dutch government, to which all goods destined for Holland by sea are required to be consigned; the real interest in the merchandise being retained by the merchants dealing therein. Before the goods can be consigned to the Trust, the permission of the Trust has, by agreement between the Trust and the British government, first to be obtained, and the permission so obtained constitutes a permit recognized by the Allied patrol vessels and men of war, and requires the captains of the Allied patrol vessels and men of war to permit the cargo to proceed to the Dutch port to which they are consigned; that in the absence of such permission the British government treats such cargoes as contraband, and seizes and confiscates the same, and refuses to permit the vessel to proceed to her Dutch destination."

The libelant's position rests upon the theory that the schooner was in default, in that it had appeared that the voyage was impossible, and that it was idle to require of the claimant performance which would not only have been frustrated, but would have involved the parties in heavy loss.

A. Leo Everett, of New York City, for libelant.
Clarence Bishop Smith, of New York City, for claimant.

LEARNED HAND, District Judge (after stating the facts as above). [1] There is no absolute certainty that the claimant would have failed in performance. That he was willing to try must be assumed, and if he is to be treated as in default it can only be upon the hypothesis that the Baxter could by no possibility have escaped the blockade. That her chances were very slight is true enough, but the conclusion in some part must rest in supposition, for perhaps some schooners did slip through, and she might have been one. When, as here, the obligor remains willing, nothing short of certainty can impose upon him a default on the score of impossibility. Hence the case really fails at the outset.

[2] Passing this point, and assuming that the case is to be judged as though the Baxter had been restrained in her voyage by princes or peoples, the case is still with the claimant. I shall assume, without deciding, that the absence of any exception put the owners in default, though the voyage were frustrated by the restraint of princes; still, viewing the charter party as a whole, it seems to me clear that in accepting any such risk the owners provided for their safety by the clause written into the charter party that the cargo should be consigned to the Netherlands Overseas Trust. This the libelant answers

by saying that the words mean no more than that the bill of lading should be in favor of the Trust, just as in an ordinary consignment. The libel itself contains allegations which refute that interpretation. The situation was this: No cargoes could go forward to Holland without the consent of the Trust, which was the only agency trusted by Great Britain to distribute supplies to the Dutch. The Trust was not the true consignee in the usual sense at all; all it did was to insure to Great Britain's satisfaction that the cargoes should not leave Holland. As a part of the system the preliminary consent of the Trust was necessary. With such a consent the ship could pass the British cordon; without it, it would be stopped, if detected.

There was, therefore, no conceivable reason for a clause, certainly intended to expedite the ship, which went no further than to provide for a consignment to the Netherlands Overseas Trust in the · usual sense. Such a provision would not have helped the ship; rather it would have excited suspicion, and promoted delays and eventual discharge in a British port, if, upon being overhauled by a cruiser, the bill of lading had shown the consignment of a cargo to whose entry the Trust had not consented. It is clear, therefore, that the provision must be read in the light of the surrounding facts, all set forth in the second article of the libel, showing that the permit of the Trust was considered as a condition to a consignment of the cargo.

An analysis of the succeeding clause, also written into the charter party, makes this conclusion stronger. It is provided that for any detention over 48 hours by Great Britain or her allies the charterer shall pay demurrage. Now, if it were intended that the cargo might be consigned to the Netherlands Overseas Trust without its consent, this imposed upon the charterer a prohibitive risk.· Such a consignment would not have protected the ship, but, on the other hand, would have stopped the voyage altogether. It was hardly intended that the charterer must go on indefinitely paying demurrage, yet it is hard to see how demurrage could stop, at least before the ship was discharged. What was intended was that she should be protected by a consignment fortified by a permit, which would shorten detention and insure the completion of the voyage. It is therefore unreasonable to suppose that, with such a provision in the charter party for demurrage, either party meant to attempt a venture, dependent upon the ability of a sailing vessel to escape the British cordon, and to impose upon the charterer a vague and extremely onerous liability, if she did not.

Hence from every view it seems to me clear that the consignment presupposed a preliminary permit, and this the libelant never procured. Performance of that covenant was a condition precedent to performance by the owners, who were not obliged to carry any cargo other than that described. Thus they are not in default, and the rule in The Gracie D. Chambers, 253 Fed. 182, —— C. C. A. —— applies. Indeed, since the default was the cause of the frustration of the voyage, it is not necessary to invoke the rule in that case, for, if the charterer defaults in his covenants, he is in no event in a position to recover.

The libelant's argument does not impress me, based upon the improbability of such a contract. I see no reason to suppose that it

anticipated any difficulty in getting the permit. The "Widow Cleyndert" had already got the permit of November 14, 1916, and it must have seemed an easy thing to secure the slight change necessary. Unhappily the general situation had also changed, and performance had become impossible. That, under the hard rule which the charterer itself invokes, would not excuse performance. Even if it would, the case would then stand with each party excused by impossibility of performance, in which event the rule in The Gracie D. Chambers would again apply.

From the best possible aspect, therefore, that case controls, and the libel must be dismissed, with costs.